𝕽𝖎𝖈𝖍𝖒𝖔𝖓𝖉

## John A. Shield v. Peninsula Land Company, Inc., et als.

April 29, 1926.

1. Streets and Highways—*Obstruction—Injunction—Jurisdiction of Equity —Case at Bar.*—Where the erection of a permanent building in a public street is contemplated, application for an injunction is properly addressed to the equity forum, and in the instant case the bill contained sufficient allegations to make a case within the purview of this doctrine and was not demurrable.

2. Streets and Highways—*Obstruction—Easements—Light and Air.*—The servitudes of the civil law in respect to light and air are not recognized in the doctrine of easements as expounded in this country. But an owner of property abutting upon a street has a right to complain of a structure placed in the public highway in front of his property, and may state as one of his grounds of complaint that the unlawful obstruction interferes with the freedom of light and air above but within the lines of the highway.

3. Streets and Highways—*Obstruction—Injunction—Title of Complainant to Abutting Lots.*—In the instant case, a suit to enjoin the erection of a building in a public street, defendants insisted that the evidence was insufficient to establish plaintiff's title to the abutting lots named in the bill, and, therefore, that he had failed to show his right to ask for the injunction. Independent of the question of irreparable damage, the complainant in a case of this character must show that the injury resulting from the unlawful act complained of rests upon the violation of a right which entitles him to redress. The right which is claimed to be invaded in this case is one dependent upon the ownership of the real estate fronting on the highway, or at least a right to its control and unmolested use. Still a court of equity is not the proper forum in which to try competing titles, nor is the plaintiff called upon to prove his absolute fee simple title to the property, as in an action of ejectment. The evidence made out a *prima facie* title to the lots in question in the complainant sufficient to justify his long continued claims to and possession of them, and to enable him to maintain his suit.

4. Deeds—*Reference to Recorded Map—Map of Yorktown.*—The plan of an addition to Yorktown recorded in York county July, 1788, and designated as the "Waller Map" and showing a division into lots of the five or six acres constituting the common, is so connected with the act of 1785, authorizing the trustees to dispose of the common, as to entitle it to consideration; and conveyances of lots by references to their numbers on the plan are sufficient.

5. Streets and Highways—*Rights of Abutting Owners.*—In the instant case, complainant sought to enjoin the erection of a building in front of lots owned by him, claiming that "Water" street, Yorktown, upon which they abutted, extended from the line of his lots to the river's edge, giving it a varying width extending at some points nearly two hundred feet. Defendants insisted that Water street is only a street of ordinary width, and that the title to and control of the portion of land between the proper width of Water street and the river, including the space to be occupied by the building in question, was and is in the trustees of Yorktown.

   *Held:* After an extensive examination of the history of Yorktown, and the early statutes relating thereto, that complainant did not own the fee in the land from the edge of his lots to the shore; that the legal title to that part of the common between the line of the plaintiff's lots on Water street and the river shore was in the trustees of the town subject to an easement in the public to a street (Water street) in front of plaintiff's Water street lots, forty feet in width, and that the trustees had a legal right to lease that portion of the common lying between the forty-foot street and the river shore, or allow its use to the defendants.

6. Municipal Corporations—*Yorktown—Board of Trustees.*—The municipal government of Yorktown, if it may be so termed, is in these days *sui generis,* as the provisions for the exercise of functions of public authority over its inhabitants relate back to the original act of 1691. The legislature has kept in force for Yorktown a board of trustees in whom is vested the title to its public property, and upon whom necessarily fall some of the functions of local government.

7. Injunction—*Interfering with Discretionary Powers of Quasi Municipal Officers.*—Equity will refuse to interfere by injunction, at the behest of a private citizen, with the exercise of discretionary powers with which the officers of a *quasi* municipal corporation are clothed.

Appeal from a decree of the Circuit Court of York county. Decree for defendants. Complainant appeals.

*Affirmed*

The opinion states the case.

*Frank Armistead* and *Hall, Hall & Peachy*, for appellant.

*W. E. Hogg* and *Sydney Smith*, for appellees.

CRUMP, P., delivered the opinion of the court.

John A. Shield, the appellant, filed his bill in equity in the lower court in which he prayed for an injunction to restrain the defendants from erecting, or allowing the erection of, a certain building or structure near the beach or bank of York river, adjacent to the town of York, or Yorktown as commonly known.   He alleged that he was the owner of certain lots in the plan of the town, on one or more of which residences had been built and leased to tenants; that three of these lots faced the river and fronted on Water street; that this street had been dedicated as a highway or street for the benefit of all the lot owners specially and for use by the public generally; that Water street included all the space between the line upon which his lots abutted and the river's edge, giving it a varying width at some points nearly 200 feet, and that a lease or license by the trustees of Yorktown to the defendants proposing to erect a structure for amusement purposes on a part of this space was invalid.

Malcolm McAvoy, trustee, and Charles Warner, the persons about to erect the structure, and also the trustees of Yorktown were made parties defendant. The bill states three of plaintiff's lots, Nos. 139, 144, and 149, front on Water street, and it is alleged:

"That your complainant has, on lots numbers 149 and 148, houses which are used as dwelling houses and

if the said Charles Warner is allowed to erect his said building as he is now commencing to do it would cut from complainant's premises the view of the river and interfere with his access to the said Water street as a street, and the access of said complainant and his agents to the York river, and if said structure is allowed to be erected that your complainant will suffer great and irreparable damages."

The prayer of the bill is:

"That an injunction be granted enjoining the said Malcolm McAvoy, trustee, and Charles Warner, their agents, servants and employees, from erecting any structure or building upon the said portion of Water street lying in front of and between York river and your complainant's property as above set out; that the aforesaid attempted leases between those claiming to act as trustees for the town of York as above set out and the Investment Corporation be declared null and void and of no effect."

The Investment Corporation was the original lessee to whom the privilege of using the space in question had been granted, and from whom the above named two defendants derived their right.

The defendants, Warner and McAvoy, demurred to the bill upon several grounds, and also filed a joint answer of considerable length. In the answer it is denied that the complainant is the owner in fee simple of the lots claimed by him; and it is insisted that Water street is only a street of ordinary width, and that the title to and control of the portion of land between the proper width of Water street and the river, including the space to be occupied by the building in question, was and is in the trustees of Yorktown.

So far as the record shows the trustees of the town did not answer, nor otherwise plead to, the bill.

The final decree, from which the complainant in the case appealed, denied the injunction and dismissed the bill, the trial court expressing its views upon the case as follows:

"Then this cause came on this day to be again heard upon the papers formerly read, the joint and separate answer of the defendant, Charles Warner and Malcolm McAvoy, trustee, and exhibits therewith, with general replication thereto, the depositions of witnesses and the exhibits therewith, and was argued by counsel. On consideration whereof and the court having considered the pleadings, exhibits and all the evidence in the case, is of opinion that the plaintiff's basic contention that he, by reason of his ownership of the lots set out in his bill, owns in fee simple from the edge of said lots through Water street to York river, subject to the use of the said street by the public, is not sustained by the evidence and is hereby overruled, and doth adjudge that the legal title to that part of the commons marked on the said plat filed with the plaintiff's bill as Water street, lying between Ballard and Buckner streets and the northeast edge of the plaintiff's said lots and York river to be in the trustees of the town of York, subject to an easement in the public to a forty foot strip in width running along immediately in front of the plaintiff's said lots as a street and that the said trustees had a legal right to lease all of that portion lying northeast of the said forty-foot street to the investment corporation.

"The court is further of the opinion that the lease executed on January 5, 1910, by the then trustees of the town of York to the Investment Corporation is valid and that the said Investment Corporation had a legal right to convey the said property mentioned in the said lease to the defendants, the Peninsula Land Com-

pany, Incorporated, and that the said defendant, the Peninsula Land Company, Incorporated, had a legal right to convey the same to the defendant, Malcolm McAvoy, trustee, and the said Malcolm McAvoy, trustee, had a legal right to lease to the defendant, Charles Warner, that portion of the said land upon which the building described in the plaintiff's bill was to have been erected.

"The court is further of opinion that the said plaintiff has not established by his evidence that the *erection* of the building, set out and described in his bill, by the defendant, Charles Warner, would affect his, the said plaintiff's, right of access, air, light and view."

The material facts in the case should be stated:

Towards the end of the 17th century it became the policy of the colonial government of Virginia to encourage the settlement and growth of towns, and to fix the ports of entry, as the population of the colony was scattered over such a wide area. In the year 1691 the Colonial Assembly passed an act entitled "an act for ports, &c." 3 Hening's Statutes, page 53. This act was of considerable length, its general purpose being to provide for the acquisition of fifty acres of land at different points along the tidewater rivers in the colony, these several locations being designated in the act. The stated number of acres was to be conveyed to feoffees or trustees to be designated by the county court, and they were to hold the property in fee simple for the purposes named in the act, and were directed to convey the tract of land, in half-acre lots, to such persons as might accept them, upon the terms and conditions named in the act. In fixing the places for the ports it is provided:

"That these several nominated ports, wharfes, keyes and places hereafter named and set downe, be and shall

be the severall and respective ports, wharfes, keyes, and places constituted and appointed by this act for the uses, intents and purposes before named, that is to say   *   *   *   *   *   *   *   *   *

"For Yorke county upon Mr. Benjamin Read's land beginning at the lower side of Smith's creeke, and so running downward by the river toward the Ferry."

Benjamin Read conveyed the tract of fifty acres to two trustees named by the county court, and the land was divided into lots upon a plat made by Lawrence Smith the county surveyor. This survey and plat still exists upon the records of York county. All the lots were readily disposed of except two, Governor Nicholson and other celebrities of those days being among the purchasers. Bruce Economic History of Virginia in 17th century, vol. II, page 557.

The fifty acre tract, as surveyed and laid off in lots by Lawrence Smith, did not reach the river shore. The general direction of the course of York river at this point is eastwardly, York county being on the south side and Gloucester county on the north side of the river. The line of the town next to the river as located by Smith for the lots ran along the top of a bluff below which the river flowed, so that apparently the trustees did not acquire title to the land between the river and the brow of the bluff, sloping down the bluff and across a comparatively level space and sandy beach to the edge of the river; this strip along the river varying in width though it is now wider, doubtless from accretion to the shore line in the course of time. How this occurred does not appear, but it was evidently intended that the fifty acres should abut immediately upon the river as, among the purposes of the settlement, the act says for "ports, wharfes, keyes and places for receiving on shore and shipping all

goods, tobacco, merchandise, &c., and for erecting warehouses and other houses." After the death of Benjamin Read, his heir, George Read, set up a claim to this strip of land, covering five or six acres, and so interfered with the residents who had gathered in the little village, in their shipping and exporting, and with the colonial authorities in collecting the duties. Lawrence Smith's plat of 1691 has on it, not only the location of the lots, but also a small general sketch of the lines of the tract of land showing the river front, and he attached this note to this sketch:

"There is about five acres laid out between the town and the river for a common shore of no value except at the poplar. Law. Smith." This poplar appears to have been outside of all the property in question.

In order to remedy the situation arising from George Read's claim, the Colonial Assembly passed an act in 1738 "for better securing the title" of the five acres in the trustees and setting aside the same "for a common, for the use of the inhabitants of said town." 3 Hening's Statutes, page 68. This act recites the making of the survey and the execution of the deed to the trustees "by the name of all that fifty acres of land, be the same more or less, surveyed by Colonel Lawrence Smith, and bounded as in the said deed is described; together with all and singular the ways, waters, easements, passages, profits, commons, commodities, and appurtenances, to the same belonging, as by the said plan and deed more fully appears."

It is manifest that the colonial lawmakers were expressing their opinion that Benjamin Read, who was a citizen of wealth and of consequence in the colony, had intended to convey the shore property as in some sort an appurtenance to the fifty acres, and that this intention appeared from the survey and the language

of the deed. Doubtless Benjamin Read had been using the shore for shipping purposes of his own, and he knew the purposes of the first act required a shore front and river landing. The act, however, proceeds to narrate that many persons had built houses in the town; that the shore property was essential for the inhabitants, and it was thought best to extinguish the claim of George Read, and therefore the trustees were directed to raise 100 pounds by levy upon the inhabitants of the town, and to pay this sum to George Read.

The act does not contemplate a deed from George Read, but fixes the title in the trustees in the following manner:

"That all the land lying between the said fifty acres of land before mentioned, to be surveyed by the said Lawrence Smith, and the low water mark of York river, opposite to the said fifty acres, be and hereby is vested in Lawrence Smith and Thomas Nelson, gentlemen, the present feoffees of the town of York, in fee simple, in as full and ample manner, to all intents and purposes, as if the said land had been actually included in the survey of the said fifty acres; and the same shall be, and is hereby, declared to be and remain, as and for a common, for the use of the inhabitants of said town, from henceforth for ever."

The act does not recite that the claim of George Read had been compromised or that he had agreed to accept the sum to be paid him. This action of the assembly therefore was rather in the nature of a condemnation of the property for public purposes by the plenary power of the lawmaking department of the government, without the intervention of an *ad quod damnum* proceeding. The contending claimant of the property acquiesced in the method provided in the act for disposing of any right he had; and thereby the title

to this additional tract became absolutely vested in the trustees, to be held by them under the terms of both acts as public property.

In the year 1784 a new complement of trustees was named for the town, many of the prior trustees having died or removed. 11 Hening's Statutes, page 473.

During the first half of the 18th century, Yorktown became quite a thriving community, the court house being located there, and before 1750 it was the foremost seaport town of the colony. It was, and still is, the point at which there is a ferry across York river, connecting on both sides with public roads. The common, or shore, must have been for a long period of years a scene of busy activities in connection with the wharfage, storing, warehousing, and shipping of tobacco and other merchandise. After the revolution other and more available ports were opened, and also the ocean traffic between England and Virginia necessarily declined and with it the important position occupied by Yorktown, though the town remained a shipping point of considerable use.

In October, 1785, we find the following act:

"Be it enacted, &c., that the trustees for the town of York be, and they are hereby, authorized and empowered to lay out, allot, and dispose of, certain lands added to the said town of York as a common by an act of Assembly passed in the year 1738, and to dispose of said lands in such manner as they, or a majority of them, shall judge most for the benefit and advantage of the said town; and that the said lands shall be annexed to and considered as a part of the said town of York." 12 Hening's Statutes, page 218.

This act gave the trustees power to sell and dispose of the entire shore property, or such part of it as they might deem most for the benefit and advantage of the town.

The record in this case shows that the trustees proceeded under the authority of this act to plat the commons, or a portion of it, in lots and to sell these lots to individual purchasers.

By deed of January 12, 1788, the trustees conveyed to Enoch Lyon two lots noted in the deed as "part of the common aforesaid marked in the plat of the said common and known by the No. 148 and 149, as on the records of the county court of York county will appear."

Filed with the bill in this case is a copy of a plat on record in York county, on the face of which the following inscription is written by the clerk of the county court in 1788, viz:

"A plan of York Town produced in York county court the twenty-first day of July, 1788, and ordered to be recorded. Robt. H. Waller, C. Y. C."

On the plan the tract of land formerly used as a common is divided into lots with intervening streets running towards the river. In the space between the line, upon which the lots facing the river abut, and the edge of the river as indicated by an irregular line, is written "Water Street." Fronting upon this line next to the river, and therefore facing Water street are three of the lots claimed by the plaintiff, Nos. 139 and 149 between two streets afterwards known as Ballard and Buckner streets, and No. 144 adjoining and just north of Buckner street.

In 1786 an act was passed incorporating the town of York, providing for the election of a mayor and a council and the establishment of a hustings court. The record does not show that a municipal corporation was ever organized under this act. We presume in fact its provisions were never availed of, or if so temporarily, that the incorporation was abandoned. This would seem to be true from the deed made in 1788, and

an act pased in December, 1806, conferring certain powers upon the trustees. Acts 1806-07, ch. 60.

The town has unquestionably been, since 1691 to the present time, under the control of its trustees.

Yorktown was visited by a very disastrous fire in 1814 which destroyed a large portion of its buildings. From that time on the town seems to have lost its significance, although its name had become the token of one of the most illustrious events in the nation's history. It is said that just before the Revolutionary War the town contained a considerable number of inhabitants; and then a careful historian records the number of its residents in 1834 as 282. As may be expected, therefore, we find but little further legislation concerning the town prior to the Civil War.

By the following acts trustees for Yorktown were appointed from time to time, viz:

Acts 1823-24, page 80, Acts 1871-72, page 261, Acts 1891-92, page 1003, Acts 1899-1900, page 42, Acts 1918, page 464. These acts all refer to the original act of 1733.

[1] The first question to be considered by the court arises upon a cross error assigned by the appellees, who claim that their demurrer to the bill of complaint should have been sustained and that the trial court erred in overruling it. Various grounds of demurrer were insisted upon, but it is not necessary to notice them in detail. The legal principle invoked by the prayer for an injunction was fundamental—that the defendants sought to be enjoined were obstructing a public street by purposing to erect upon it a permanent structure. That such an application is properly addressed to the equity forum is well settled. *Chambers* v. *Roanoke I. Asso'n,* 111 Va. 254, 68 S. E. 980; *Reed* v. *Seattle, et als.,* 124 Wash. 185, 213 P. 923, 29 A. L. R.

446. . The bill of complaint contains sufficient allegations to make a case within the purview of this doctrine.

[2] A great deal of the argument by the learned counsel before this court was directed against and in defense of the plaintiff's claim that the intended building would obstruct the right of light, air, and view of the river from his lots facing on Water street. It is true that the servitudes of the civil law in these respects are not recognized in the doctrine of easements as expounded in this country. But the claim of the plaintiff, insofar as it is entitled to consideration, does not rest upon the law of easements, applicable between adjoining owners of private property. An owner of property abutting upon a street has a right to complain of a structure placed in the public highway in front of his property, and may state as one of his grounds of complaint that the unlawful obstruction interferes with the freedom of light and air above but within the lines of the highway. 37 Cyc. 206; 13 R. C. L. 142.

We find no error on the part of the trial court in overruling the demurrer to the bill.

Coming to the merits of the case there are two preliminary questions that must be dealt with.

[3] The appellees, defendants in the lower court, insist that the evidence is insufficient to establish plaintiff's title to and ownership of the lots, seven in number, named in the bill, and, therefore, he has failed to show his right to ask for the injunction. Independent of the question of irreparable damage, the complainant in a case of this character must show that the injury resulting from the unlawful act complained of rests upon the violation of a right which entitles him to redress. The right which is claimed to be invaded in this case is one dependent upon the ownership of the real estate

fronting on the highway, or at least a right to its control and unmolested use. Still a court of equity is not the proper forum in which to try competing titles, nor is the plaintiff called upon to prove his absolute fee simple title to the property, as in an action of ejectment. The title to the property in question is not put in issue between the plaintiff and defendants, as the latter set up no claim to it. A considerable portion of the evidence relates to the title of the plaintiff to the several lots, which is denied and seriously challenged by the defendants. A review of this testimony would be both tedious and needless. An unlawful and injurious restraint in any form upon the use and enjoyment of property or a right is a deprivation and may entitled one to injunctive relief. In cases of this sort a *prima facie* showing of title is sufficient, even in a case of an ordinary trespass, as the plaintiff is not held to recovery upon the strength of his own title as in an action of ejectment. *Ely* v. *Johnson*, 114 Va. 31, 75 S. E. 748. The defendants in the instant case do not show title to the lots in themselves or any one else. Without intending to hold that the plaintiff has shown a fee simple title to all the loss, or to debar any one from asserting and proving against the plaintiff a better title to any of the lots, in a proper proceeding at law, we are of opinion that the evidence makes out a *prima facie* title in the plaintiff to the lots 149 and 148, sufficient to justify his long continued claim to and possession of them, and to enable him to maintain this suit. The plaintiff has a residence on lot 149, constructed some years ago, and in recent years leased to tenants for occupancy, and he is entitled to remove any unlawful interference with the fair use of these premises.

[4] The second of the two preliminary questions arises

upon the contention on the part of the appellees that the plan, referred to above, recorded in York county in July, 1788, and showing a division into lots of the five or six acres constituting the common, is not so connected with the act of 1785 authorizing the trustees to dispose of the common as to entitle it to consideration; this plan being designated as the Waller Map. This position is plainly not tenable. An order entered in York county court on the day the Waller Map was recorded is as follows:

"At a court held for York county at the courthouse in the Borough of York on Monday the 21st day of July in the year of our Lord one thousand seven hundred and eighty-eight in the thirtieth year of the Commonwealth.

"Present     *     *     *     *     *     *
On the motion of Thomas Nelson, Gent. It is ordered that the Platt of the Borough of York with addition thereto lately drawn and now before the court be recorded."

It is true that the Waller Map covers only the addition and not the entire town. Whether the plat did embrace the whole town as well as the addition, and the clerk thought it necessary to make a copy on the record of only the addition, or whether the plat as presented was recorded in its entirety, is not material in view of the other facts in the case. It is nowhere suggested in the record, nor in argument of counsel, that there was either made or recorded, or has ever existed, any other plan showing a division of the common into lots as authorized by the act of 1785. The deed made in 1788, by which the trustees undertake to convey lots 148 and 149, refers to a plat then on record and it is scarcely possible that this reference could have been to any other plan than the Waller Map.

We infer from the record that a large number, perhaps all of the lots ever conveyed by numbers, and there could have been no other source for platted reference except to the Waller Map. In many of the documents put in evidence, whenever any reference is made to a plat, it is to the Waller Map in terms. In a lease made by the trustees of the town in 1901, and again in 1909, they refer to the Waller Map, regarding it as a matter of course as the official plan showing the division of the common into lots. The conclusion is inescapable that the Waller Map has been adopted officially and unofficially as the governing plan showing the division of Yorktown into lots.

[5] Finally, did the court below correctly decide: (a) That the plaintiff had failed to sustain his contention that by reason of his ownership of the lots he owned in fee simple from the edge of his lots on Water street down to the water's edge, and (b) that the legal title to that part of the common between the line of the plaintiff's lots on Water street and the river shore was in the trustees of the town subject to an easement in the public to a street (Water street) in front of plaintiff's Water street lots, forty feet in width, and (c) that the trustees had a legal right to lease that portion of the common lying between the forty foot street and the river shore, or allow its use to the defendant?

The main argument for the complainant is based upon the theory that the words "Water street" written upon the Waller Map, between the line of lots facing the river and the river, import an intention on the part of the trustees to dedicate this entire space as a street, so that the whole width of this strip varying perhaps from 75 feet to 150 feet or more became a public highway, and hence the control of the trustees over it ceased, and the defendants are thus found obstructing a public

highway. We find practically nothing in the record, except the single fact that those words occur in the blank space between the lots and the river, to sustain even an argument to the extent claimed. It is scarcely conceivable that the trustees intended to open a regular street in the addition of such unusual and unnecessary width, and assume in connection with it the burdens accompanying a street in the town. That this should be done was not in harmony with the acts relative to the establishment of the town, evincing an intention to leave the shore or beach open for the use of its inhabitants, subject to the control and management of the trustees. The statute, above referred to, on page 90 of Acts 1823-24, re-enacts the brief act of 1785, so that some of the lots in the addition apparently remained unsold; but nothing in this act tends to confirm the theory of the plaintiff. On the other hand, the documentary and other evidence shows that the trustees of the town have, practically without dispute, for a hundred years and more claimed and exercised the authority and power to direct the use of the beach shore in question in such manner as in their discretion they deemed best for the town and its inhabitants. Without underdertaking to recite this evidence, we are of opinion that it supports the statement just made. In our opinion, the words written on the Waller Map were intended to and did indicate that there could be located along the line of the lots facing the river a street or road; and the evidence shows that along that line so much of the adjoining space as was usual and necessary was used as a road. The general width of the streets, in the main part of the town as laid out by Smith, and also in the plan of the addition, was about thirty-three feet. In one or more of the maps filed with the record, made between 1860 and 1900, this street is given a width of either thirty feet or thirty-three feet. By an order of the

county court of York in 1869 a survey of the commons, or the portion of the town next to and adjoining the river, was ordered and the survey and plat returned gives Water street a width of thirty-three feet. The jurisdiction of the county court to order this survey is challenged, yet it is proof of the recognition of the thirty-three foot street, and in so far as the county is concerned might be taken as an acceptance on its part of a road of that width. In the year 1881 the trustees of the town made various leases, and granted a number of privileges to numerous parties, allowing the occupancy of spaces fronting on the north side of Water street running back to the river, or in some instances to use the shore; two steamship companies having sometime before that procured from the trustees the right to build wharves and occupy part of the shore. In a lease of part of the shore property made by the trustees in April, 1901, to one Charles Gallagher a width of thirty feet is assigned to Water street. In the documents authorizing the Investment Corporation, under whom the defendants claim, to occupy a portion of the common, made in 1909 and 1910, the street is referred to as follows: "Said Water street being limited and defined as being forty feet in width." Doubtless for this reason the lower court, in its final decree, allowed a width of forty feet to the street. This, however, is not prejudicial to the plaintiff as his claim is that Water street extends to the river shore, and as it sufficiently appears that the defendants do not use or occupy any portion of the forty feet allowed for the width of the street. The record shows that, during the past few years, in this progressive time of cement roads and automobiles, considerable attention has been given to Yorktown, many investments have been made there, and many persons have been attracted to the town and

its ·excellent site on a broad tidewater river not far from Chesapeake Bay.

The old colonial village, dwarfed and isolated for so many years, seems to have put on new life. It may be a matter of importance therefore to have any dispute as to Water street settled, as it extends quite a distance along the river front of the town. In our opinion the facts of this case justify the court in allowing it a width of forty feet, and in declaring the residue of the space to be under the control of the trustees of the town. In the course of the argument here, it has been insisted that the plaintiff is the owner in fee simple at least to the centre of the street, subject to an easement of the public to its use as a public highway, and many authorities are cited to sustain the argument. That question, however, is not material, in our view of the case. The title, as well as the authority to control the street, is in the mean time in the trustees; and the right of the plaintiff in the respect mentioned can only arise under the doctrine of reverter in the event of a permanent abandonment of the forty foot street. We are of opinion, therefore, that the lower court was correct in its ruling above mentioned under (a) and (b).

As we are of opinion that the structure complained of is not being erected in a public street or highway, we need not discuss the necessity of proof of some special injury peculiar to the plaintiff and independent of the injury to the public, nor the *quantum* of such proof as a prerequiste to an injunction protecting an abutting owner's easement of light, air, and view; the latest authorities as to these doctrines are collated in a case and note in 40 A. L. R. 1313.

[6] The municipal government of Yorktown, if it may be so termed, is in these days *sui generis*, as the provisions for the exercise of functions of public author-

ity over its inhabitants relate back to the original act of 1691. Much needless speculation might be indulged as to the discretionary power vested in the trustees under the Acts of 1691, 1738, and the subsequent statutory enactments up to 1918, in the matters of the exercise of the police power and of the control and disposition of public property pertaining to the community.

The Virginia Codes from the Code of 1819 to the Code of 1873, in the general chapter on towns, recognize towns under the supervision of boards of trustees, confer certain powers upon them, and direct that vacancies in their number shall be filled by election. The general chapter on towns in the present Code (1919) refers only to incorporated towns with a mayor and council. Without undertaking to define the limitations upon the authority of the trustees of Yorktown, or the extent to which the county authorities may exercise jurisdiction over the town and its inhabitants, we find, so far as the question at issue is concerned, that the legislature has kept in force for Yorktown a board of trustees in whom is vested the title to its public property and upon whom necessarily fall some of the functions of local government.

(We understand that the legislature just adjourned [1926] passed an act providing that the circuit court for the county should appoint the trustees, and fixing their terms of office and powers.)

[7] The course of the legislation for this purpose shows that the title to the original common, so far as not parted with, is still in these trustees, and that it is to be managed by them as public property for the benefit of the community at large. The evidence establishes that this has been the situation for upwards of a hundred years. We are of opinion that the trustees are authorized to hold and manage this property as they in

their discretion, fairly and honestly exercised, deem best for the interests of the community. An analogy may be found in the power with which boards of supervisors of counties are clothed as held in *Ferguson* v. *Board of Supervisors*, 133 Va. 561, 113 S. E. 860. We find nothing in the record to impugn the good faith of the present trustees in exercising an authority which their predecessors for many years before had claimed and exercised as a right incident to their office. As held in the case just cited equity will refuse to interfere by injunction, at the behest of a private citizen, with the exercise of discretionary powers with which the officers of a *quasi* municipal corporation are clothed.

Complaint is made by the plaintiff of the method, claimed to be irregular, by which the trustees agreed to execute and did execute the lease of the portion of the common property involved. Having held that the property involved is not a part of a public highway, and as the record does not disclose any disagreement between the trustees and the defendants claiming the right to build the structure in question, nor any disclaimer by the trustees of having granted the chief defendants the privilege to do so, the manner in which the privilege was conferred and its duration need not be considered unless at the instance of the trustees.

The defendants building the structure on a part of the public property, which is not a highway, are doing so with the consent of the trustees so far as the record shows, and, therefore, the injunction was properly denied. We do not pass upon any question relative to the right of the trustees to terminate the occupancy of the property by the said defendants, nor as to the effect of any of the provisions of the leases made by the trustees.

The width of Water street should be permanently

fixed, and we are in accord with the lower court in adopting a width of forty feet, that being the width designated by the trustees in their lease in 1910 to the present claimants, of the privilege of building between the street and the river.

Upon the whole case we are of opinion that no error has been shown in the decree of the circuit court and it is, therefore, affirmed.

*Affirmed.*

CHINN, J., dissenting.